**W. Scott MILLER, Plaintiff,**

v.

**Sheriff Aaron D. KENNARD,
et al., Defendants.**

**No. 2:98CV00041C.**

United States District Court,
D. Utah,
Central Division.

Oct. 1, 1999.

---

Robert B. Sykes and Ronald J. Kramer, Salt Lake City, UT, for W. Scott Miller.

Raymond A. Hintze, Patrick F. Holden, Salt Lake City, UT, for Salt Lake County.

David Westerby, Kirton & McConkie, Salt Lake City, UT, for Sheriff Aaron D. Kennard.

Karra J. Porter, Christensen & Jensen, Salt Lake City, UT, for UnderSheriff James Bell.

## ORDER

CAMPBELL, District Judge.

This matter comes before the court on defendants' motions for summary judgment. The court conducted a hearing on this matter on August 16, 1999, at which the plaintiff was represented by Robert B. Sykes and Ronald J. Kramer, Sheriff Kennard was represented by David Westerby, Undersheriff James Bell was represented by Karra J. Porter, and Salt Lake County was represented by Patrick F. Holden and Raymond A. Hintze. Having considered the arguments of counsel, the submissions of the parties, and applicable legal authority, the court now enters the following order.

### Background

For nineteen years, plaintiff W. Scott Miller was an employee of the Salt Lake County Sheriff's Office. He was an exemplary employee, receiving good job reviews from his supervisors and commendations from members of the public for his work in law enforcement.

In 1997, while still employed with the Sheriff's Office, Miller agreed to be an expert witness for the Cruz family in their lawsuit against the Middlekauff Lincoln–Mercury automobile dealership.[1] Gregg Middlekauff, owner of the Middlekauff dealership, was a friend of defendant Sheriff Aaron Kennard: Middlekauff had, in the past, made contributions to Kennard's campaigns for Sheriff.

It was Miller's opinion that the Middlekauff dealership should have foreseen that dealership cars would be stolen, that stolen cars are likely to be driven dangerously, and that the injury to the Cruzes was foreseeable. Miller based his expert opinion on his own experiences and observations, and on information given him by the Cruzes' counsel. Because of Sheriff Department policies, Miller did not intend to testify regarding the conduct of police officers pursuing the thief in the stolen car.

On June 10, 1997, Miller submitted a secondary employment request to the Sheriff's Office, describing his work in the Cruz litigation as "consulting" about "law enforcement issues." (See Pl.'s Mem. Opp'n Summ.J. Ex 5). He did not submit his expert report to the Sheriff's staff or discuss the details of his testimony with the Sheriff. The secondary employment request was approved by Miller's division commander, Lee Smith. On June 20, 1997, Miller was designated in the Cruz litigation as the plaintiffs' expert witness.

On August 27, 1997, the Middlekauff defendants obtained new trial counsel, Michael Skolnick and Shawn McGarry. The

---

1. In the Cruz litigation, the Cruz family sued the Middlekauff dealership for the injuries suffered by the Cruzes when a thief driving a stolen Middlekauff car ran into them while evading the police. The Utah Supreme Court, in an interlocutory review of the district court's denial of a motion to dismiss, held that the Cruzes had stated a claim for relief, holding that an auto dealer that left keys in the ignition of cars, failed to provide adequate surveillance, knew from prior thefts that unattended cars were likely to be stolen, and knew that stolen cars were likely to be driven recklessly, had a duty to the general public to secure the vehicles on the dealership lot. See *Cruz v. Middlekauff Lincoln–Mercury, Inc.*, 909 P.2d 1252 (Utah 1996). The case was then remanded to the state trial court for further motions and trial.

new defense counsel deposed Miller on September 5, 1997.

On September 11, 1997, plaintiffs' counsel deposed Gregg Middlekauff. During his deposition, Gregg Middlekauff stated that he was very concerned about Miller's testimony in the Cruz case. That afternoon, following Middlekauff's deposition, Middlekauff's attorney, Michael Skolnik, left a message for Sheriff Kennard regarding the Cruz case, questioning Miller's involvement as an expert witness.

On the day following Middlekauff's deposition, Kennard received the message from Skolnik, and, according to Sergeant Mike Julian, Kennard "went livid." (See Pl.'s Mem. Opp'n Summ.J. Ex 7 at 6). Skolnik spoke with Captain Nielsen of the Sheriff's Office, asking for an investigation of Miller's involvement in the Cruz litigation; Skolnik also asked that the Sheriff's Office assist the Middlekauff defense team in opposing Miller's testimony. At the request of Sheriff Kennard, defendant Undersheriff James Bell initiated an Internal Affairs Investigation of Miller based on Skolnik's complaint about Miller's involvement in the Cruz litigation. Finally, at the end of the day, Sheriff Kennard issued an order transferring Miller from his position as the sergeant supervising the SWAT team to the Communications Department, effective as of October 1, 1997.

In sharp contrast to the position Miller had held as supervisor of the SWAT team, a respected and sought-after law enforcement assignment, transfers to the Communications Department were generally perceived by other officers in the Sheriff's Office as punishment. In fact, the job of supervisor of the Communications Department had once been filled by noncommissioned civilian staff.

Sometime in the next week, Sheriff Kennard asked Sergeant Jim Potter, the Sheriff's Office public information officer, to act as a witness for the Middlekauff defense.

On September 25, 1997, Miller, Kennard and Undersheriff Bell met to discuss upcoming trial testimony in the Cruz case. Kennard refused to allow Miller's attorney to attend. Miller stated that since Sergeant Potter was now testifying for the Middlekauff defense, Miller worried that his own testimony might violate the Sheriff's Office policies against any officer testifying in a case on the opposite side to a fellow officer. Kennard blamed Miller for the conflict and refused to state whether or not Miller had violated department policy. Miller offered to retire from the Sheriff's Office if Kennard would agree to rescind his transfer to communications and pay him his accrued vacation time. Kennard accepted Miller's offer of resignation.

Miller has now brought this action under 42 U.S.C. § 1983 against Sheriff Kennard, Undersheriff Bell, and Salt Lake County. The parties have stipulated to dismiss Miller's second, third, fourth, and fifth claims. Miller's remaining claims allege that the Kennard and Bell violated his First Amendment right of free speech, and allege that Salt Lake County is subject to municipal liability for their actions.

*Discussion*

## I. *Standard of Review*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co: v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1552 (10th Cir.1997). Once the moving party has carried its burden of indicating that there is no genuine issue of material fact, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there

is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)); *see also Gonzales v. Millers Cas. Ins. Co.,* 923 F.2d 1417, 1419 (10th Cir.1991). The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. *First Amendment Claims*

 Miller alleges that Kennard and Bell violated his First Amendment rights by initiating a punitive investigation and transferring him in retaliation for his expert witness testimony in the Cruz case.[2] In cases alleging retaliation against a public employee in violation of the First Amendment, the court must analyze a plaintiff's claim using a four-step analysis. First, the court determines whether the public employee's speech touches on a matter of public concern. *See Connick v. Myers,* 461 U.S. 138, 146–47, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Second, if the speech does touch on matters of public concern, the court then balances "the interests of the [employee], as a citizen, in commenting upon matters of public concern" against the state's interest "as an employer, in promoting the efficiency of

the public services it performs through its employees." *Pickering v. Board of Educ.* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Third, if the employee's speech interests outweigh the city's efficiency interests, the plaintiff must prove the protected speech was a motivating factor in the employment action. *See Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Finally, if the plaintiff has made the required showing, the burden then shifts to the defendant, who must show by a preponderance of the evidence it would have reached the same employment decision in the absence of the protected activity. *See id.* The first two steps must be resolved by the court as matters of law; the last two steps are ordinarily questions for the trier of fact. *See Cragg v. City of Osawatomie,* 143 F.3d 1343, 1346 (10th Cir.1998); *Melton v. City of Oklahoma City,* 879 F.2d 706, 713 (10th Cir.1989); *Wulf v. City of Wichita,* 883 F.2d 842, 856–57 (10th Cir.1989).

### A. *Miller's Speech Touched on Matters of Public Concern*[3]

The Tenth Circuit has pronounced broadly that "[m]atters of public concern are those of interest to the community, whether for social, political or other reasons." *Dill v. City of Edmond,* 155 F.3d 1193, 1202 (10th Cir.1998) (quoting *Lytle v. City of Haysville,* 138 F.3d 857, 863 (10th Cir.1998)). In *Dill,* the Tenth Circuit evaluated claims by a police officer who alleged that he had been transferred to an undesirable position in violation of his First Amendment rights. Dill had worked

---

**2.** Miller also claims that Kennard's and Bell's acts constituted a constructive discharge from the Sheriff's Office. However, none of the parties have briefed the constructive discharge claim, so the court will not consider it in this order.

**3.** In his opposition, Miller urges the court not to apply the public concern test, citing *Flanagan v. Munger,* 890 F.2d 1557 (10th Cir.1989). In *Flanagan,* the Tenth Circuit found that police officers who owned a video store that

rented explicit videos engaged in protected First Amendment activity, and that the act of owning a video store constituted "expression" touching on public concern even though the act was non-verbal. The Tenth Circuit found that the *Pickering* test did not apply to the facts of the case, since no "speech" was involved. *See Flanagan* at 1563. However, Miller's expert report and proposed testimony are clearly speech, which are more properly analyzed using the First Amendment standards defined in *Pickering.*

**1058**

as a detective and believed that the police department had withheld exculpatory evidence in the trial of a murder suspect. Dill wrote a letter to the police chief explaining that he believed that the district attorney should be made aware of the exculpatory evidence. *See id.* at 1200–01. The Tenth Circuit panel determined that Dill's statements involved matters of public concern, since they related to possible misconduct by police officers. *See id.* at 1202.

The Tenth Circuit also considered facts analogous to those presented by Miller in *Melton v. City of Oklahoma City,* 879 F.2d 706 (10th Cir.1989). Melton was fired from his job as a police officer because he testified at trial on behalf of a criminal defendant and because he disclosed the contents of an interview with prosecutors to the defense counsel. Among other claims, Melton filed a § 1983 claim alleging violation of his First Amendment rights.[4] The court found that Melton's speech in all aspects touched on matters of public concern, since the defendant Judge William Page was a public official under investigation for misconduct in his official duties, even though Melton's intent was to provide assistance to the defendant and not specifically to inform the public. *See id.* at 714. The court also found that Melton's trial testimony was protected speech: "The First Amendment protects the right to testify truthfully at trial." *See id.*

In contrast, courts have made clear that employee complaints about personal employment issues do *not* touch on matters of public concern. "The First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *See Connick v. Myers,* 461 U.S. 138, 149, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (finding that employee who circulated questionnaire in the office criticizing management policies did not engage in protected speech, and that her conduct disrupted the efficient functioning of the office); *see also Koch v. City*

*of Hutchinson,* 847 F.2d 1436, 1445 (10th Cir.1988) ("the focus [of the court's inquiry] is on the role the employee has in advancing the particular expressions: that of a concerned public citizen ... or merely as an employee, concerned only with internal policies or practices which are of relevance only to the employees of that institution").

█ Clearly, Miller's speech does not fall within the area of personal employment complaints. The foreseeable risk to public safety caused by the dealership's practice of leaving keys in the ignition of unguarded cars is obviously an issue "of interest to the community, whether for social, political or other reasons." *Dill,* 155 F.3d at 1202. While Miller planned to testify regarding the conduct of a private entity rather than a public entity, the Middlekauff dealership's conduct may have created a risk to public safety.

█ Miller does not have to direct his speech at the general public to receive protection for speech on matters of public concern. *See Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (noting that a public employee does not lose his First Amendment rights when he chooses to communicate privately with his employer rather than spread his views before the public); *Dill v. City of Edmond,* 155 F.3d 1193, 1202 (10th Cir.1998) (finding that Dill's speech touched on public concerns, even though he did not communicate with the general public and expressed his concerns to the police chief and district attorney).

█ The fact that Miller received compensation for his work as an expert witness, and that he hoped to build a business as a consultant, also does not prevent his speech from touching on public concerns. *See e.g. Flanagan v. Munger,* 890 F.2d

---

4. The Tenth Circuit reheard the case en banc to reconsider its holdings regarding the plaintiff's liberty interest claims. However, the Tenth Circuit panel's First Amendment analysis was not challenged in the rehearing. *See Melton v. City of Oklahoma City,* 928 F.2d 920 (10th Cir.1991) (en banc).

1557, 1564 (10th Cir.1989) (finding that police officers' off-duty involvement in owning and profiting from a video store was protected expressive conduct).

### B. The Court Cannot Apply the Pickering Balancing Test Because of Insufficient Evidence

■■■■■ Even if an employee engages in speech touching on matters of public concern, an employer may still have a right to punish that speech if it disrupts workplace relationships or discipline, and the disruption outweighs the employee's interest in expression. *See Pickering v. Board of Educ.* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *see also Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). "That need [to prevent disruption] is particularly acute in the context of law enforcement, where there is a 'heightened interest ... in maintaining discipline and harmony among employees.'" *Moore v. City of Wynnewood,* 57 F.3d 924, 934 (10th Cir. 1995) (quoting *Wulf v. City of Wichita,* 883 F.2d 842, 861 (10th Cir.1989)); *see also Connick v. Myers,* 461 U.S. 138, 154, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("The limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships").

■■■■■ When an employer seeks summary judgment on the basis that punishing speech is necessary to preserve workplace functioning, the employer must produce evidence supporting the allegations of disruption. *See Schalk v. Gallemore,* 906 F.2d 491, 496 (10th Cir.1990) (stating that "the government must produce evidence of an actual disruption" before a court can find for the employer under the *Pickering* balancing test); *Melton,* 879 F.2d at 715–16 ("Although we recognize the potential impact that a breach of confidentiality may have on the department, we must point out that the government must introduce evidence of an actual disruption of its services resulting from the speech at issue").

### 1. Investigation

■■■■ Kennard asserts that he needed to investigate Miller to determine if Miller's outside employment violated department policies, and that the act of investigating Miller cannot constitute retaliation or detrimental employment action. While the court might, under some circumstances, conclude that a routine investigation is a necessary and appropriate response to a citizen complaint about an officer's conduct, Miller has offered evidence that this investigation was far from routine.

Salt Lake County Sheriff Office policies state that citizen complaints about officer conduct will be confidential, and should be referred to the supervisor of the officer involved. (*See* Pl.'s Mem. Opp'n Summ. J.Ex. 32 at 2–4–02.06(1)–(2)). If the complaint alleges serious misconduct, the officer's supervisor should notify the Division Commander. (*See id.*). If an immediate investigation is appropriate, the "member's immediate supervisor will personally direct such investigation.... All reports of such investigations are confidential." (*See id.* at 2–4–02.06(2)–(3)).

However, in the case of the investigation of Skolnik's complaint about Miller, Sheriff Kennard himself initiated the investigation. Even though Kennard requested an "immediate" investigation, he failed to refer it to Jeff Carr, Miller's supervising officer, as required by Sheriff's Office policy. Instead of keeping the investigation confidential, as required by policy, Kennard involved Undersheriff James Bell, Captain "Juddy" Nielsen, Sergeant Mike Julian, and Lieutenant Sydney Elliott in pursuing Skolnik's allegations. Undersheriff Bell has admitted that it would be inappropriate for him to get personally involved in an investigation because he might eventually be responsible for processing appeals. (*See id.* Ex. A at 27). However, Bell was listed as the complainant on the Internal Affairs investigation paperwork, and he carried the complaint from Kennard to Captain Nielsen in the Internal Affairs Department. (*See id.*

Ex. 16, Ex. A at 13–14). Sergeant Julian's letter closing the investigation is addressed to Bell. (*See id.* Ex. 23). Furthermore, Lieutenant Elliott testified that it was unusual for the Sheriff or Undersheriff to get involved in any citizen complaints about officer conduct, and that complaints about officers' secondary employment were very rare. (*See id.* Ex. H at 36–37; 39). Elliott stated that when he received the complaint he did not think Miller had done anything wrong in working as an expert witness, and that the allegations were "minor ... I just don't think that it's really a big deal." (*See id.* at 27–28, 39).

Kennard has submitted no evidence showing that even a routine, supervisor-level investigation in response to Skolnik's complaint was necessary to prevent disruption and maintain discipline within the Sheriff's Office. Furthermore, Kennard provides no evidence supporting his bald assertion that it was necessary to initiate an expedited investigation at the very highest levels of the Sheriff's Office, without following established procedures. Without evidence supporting the need for such an extraordinary and unusual investigation, Kennard has failed to meet the burden, required by this defense, of producing evidence of disruption.

The court will determine at trial whether or not Kennard's alleged need to conduct this type of investigation outweighed Miller's demonstrated interest in freedom of speech.

#### 2. *Transfer*

Kennard argues that the decision to transfer Miller was completely unrelated to Miller's work as an expert witness. As discussed in the following section, Miller has submitted evidence sufficient to create an issue of fact regarding Kennard's motivation in making the transfer decision. In making this argument, Kennard necessarily concedes that there is no counterbalancing departmental interest justifying Miller's transfer. If, at trial, Miller succeeds in showing that Kennard's transfer decision was motivated by Miller's protected

speech, the *Pickering* balancing test would tip in Miller's favor.

#### C. *The Employment Decisions*

The defendants contend that the investigation was not burdensome enough to rise to the level of a disciplinary action that violated the First Amendment. Defendants also argue that the transfer was not motivated by Miller's speech.

#### 1. *Investigation*

In the context of retaliation for protected speech, the Tenth Circuit has rejected the position that "only adverse employment decisions, such as termination, suspension, or transfer, in retaliation for constitutionally protected conduct are illegal," holding instead that "[a]ctions short of an actual or constructive employment decision can in certain circumstances violate the First Amendment." *Morfin v. Albuquerque Public Schools,* 906 F.2d 1434, 1437 n. 3 (10th Cir.1990); *see also Schuler v. City of Boulder,* 189 F.3d 1304, 1310 (10th Cir. 1999) (finding that an employer violated the First Amendment when it removed job duties, verbally reprimanded an employee, issued a low job performance evaluation score, and involuntarily transferred her in retaliation for protected speech); *Dill v. City of Edmond,* 155 F.3d 1193, 1205 (10th Cir.1998) (noting that a constitutional violation occurs "in the imposition of *any* disciplinary action for the exercise of permissible free speech.") (internal citations omitted; emphasis added).

■ As discussed above, employers may have a justifiable right to investigate allegations of misconduct, and such investigations do not automatically constitute detrimental employment decisions. However, Miller has offered evidence suggesting that Kennard's investigation of him was excessive, unusual, disproportionate to the allegations, and conducted in violation of Sheriff's Office policies. Viewed in the light most favorable to Miller, the non-moving party, the court finds that the investigation

could rise to the level of a detrimental employment decision.

There is no dispute that the investigation was motivated by Miller's decision to testify in the Cruz matter: Kennard admitted in his deposition that he initiated the investigation in response to Skolnik's complaint about Miller's involvement in the case. Therefore, proceedings at trial will resolve the question of whether the investigation was sufficiently detrimental that it violated the First Amendment.

### 2. Transfer

The Tenth Circuit has held that transfers in retaliation for protected speech may violate the First Amendment. *See Dill*, 155 F.3d at 1204–05 (finding unwelcome transfer violated police officer's free speech rights). Therefore, if Kennard's decision to transfer Miller was motivated by Miller's involvement in the Cruz litigation, the transfer decision violated Miller's First Amendment rights.

■■■ Kennard argues he decided to transfer Miller based on the routine recommendation of Undersheriff Bell and other supervising officers. Miller, however, has provided evidence suggesting that he perceived the transfer to be punitive, and that the communications posting had been used to punish other staff in the past. (*See* Pl.'s Mem. Opp'n Summ.J.Ex. 3 at 3–5,15) (Miller's affidavit noting that he spent his career on criminal interdiction, and that he perceived the transfer to be punitive); Ex. L at 169 (depo of Miller, stating that communications position had no responsibility for criminal interdiction, that previous staff were assigned there as punishment); Ex. N. at 15–17 (depo. of Sgt. Kris Ownby, stating that lie perceived Miller's transfer to communications as "a spanking," and that previous staff had been transferred there as punishment); Ex. S at 31–33 (depo. of Sgt. Lee Smith stating that "I don't think it was viewed as an assignment that many of the deputies would want to receive"); Ex. H at 41–42, 61 (depo. of Sgt. Sydney Elliot, stating "yeah, I thought, you know, boy, that was

kind of a kick-in-the-butt-type thing" when he was questioned about Miller's transfer to communications); Ex. 7 at 10 (taped conversation with Sgt. Julian, who describes his dismay at Miller's transfer in graphic language).

The court finds that Miller has submitted evidence supporting an inference that the transfer was unconstitutionally motivated, creating an issue of fact sufficient to withstand summary judgment.

### D. Qualified Immunity

■■■ Defendants Kennard and Bell have moved for summary judgment on the grounds of qualified immunity. "A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" *Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999)).

As previously discussed, factual questions remain whether Kennard's actions violated the First Amendment. However, defendants contend that even if Kennard did violate Miller's First Amendment rights, these rights were not clearly established and they are thus entitled to qualified immunity.

■■■ A general constitutional rule already identified by the courts may apply with obvious clarity to the specific conduct in question, even though "'the very action in question has [not] previously been held unlawful.'" *United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). For purposes of qualified immunity, "'the contours of the right must be sufficiently clear that a reasonable official ·would understand that what he is doing violates the right.'" *Wil-*

*son,* 119 S.Ct. at 1699 (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034).

 The first question is whether, when the alleged violations occurred in September, 1997, the law was clearly established that Miller's speech was protected by the First Amendment. The court finds that the Tenth Circuit had clearly established that a police officer's trial testimony in a civil case is protected speech touching on matters of public concern. *See Melton v. City of Oklahoma City,* 879 F.2d 706, 729 (10th Cir.1989) (finding that "defendants should have been clearly on notice that Mr. Melton's trial testimony constituted protected speech under the First Amendment"). Furthermore, the *Melton* court found the First Amendment protected Melton's right to communicate with defense counsel regarding the case. *See id.* at 730. Since the *Melton* court clearly stated that communications with counsel are protected speech, the law protecting Miller's communications with counsel in the form of his expert report was clearly established under *Melton* in September, 1997.

 The court must next decide whether, should it be concluded at trial that the investigation constituted a detrimental, retaliatory employment action and that the transfer was motivated by Miller's speech, it was clearly established in September 1997 that such actions were in violation of the First Amendment. There is no doubt that the law was clear on this issue: "As early as 1986, we held that employment action short of discharge may give rise to First Amendment claims." *Dill,* 155 F.3d at 1205 (giving lengthy discussion of clearly established law).

 Bell argues that he is entitled to summary judgment because "there is simply no evidence in this case that James Bell did anything other than participate with other command-level staff in recommending a major personnel reorganization to Sheriff Kennard ... and later deliver a citizen inquiry to Internal Affairs at Kennard's direction." (Bell's Mem.Supp. Summ.J. at 4).

In opposition to Bell's motion, Miller has offered evidence, which, when viewed in the light most favorable to Miller, creates factual issues concerning Bell's motivation in recommending that Miller be transferred from the SWAT team to communications. The evidence indicates that Bell allegedly decided to transfer Miller three days before Kennard initiated the investigation and signed the order transferring Miller to Communications. However, issues of fact exist regarding Bell's motivation and whether Bell knew of Miller's work as an expert witness when he made his decision. Furthermore, Miller has submitted evidence creating an issue of fact regarding whether the investigation constituted impermissible retaliation. The extent of Bell's knowledge and motivation for the transfer and investigation are issues of fact that must be resolved at trial. Accordingly, at this stage of the proceedings Bell cannot claim qualified immunity for his alleged involvement.[5]

### III. *Salt Lake County's Liability for Kennard's Acts*

Miller contends that Salt Lake County is liable for the violations of his First Amendment rights because Kennard is a final policy maker for the County with regard to investigations and transfers of staff within the Sheriff's Office, and because the Sheriff had engaged in a pattern and practice of retaliatory transfers. Salt Lake County has moved for summary judgment on Miller's claims, arguing that the County

---

5. At the hearing, Bell's counsel argued that *Butler v. City of Prairie Village, Kansas* indicates that Bell is entitled to qualified immunity in this case. 172 F.3d 736 (10th Cir.1999). However, the *Butler* court found that the plaintiff's First Amendment rights had not been violated, and that the defendants were consequently entitled to qualified immunity from these claims. *See id.* at 745–747. In this case, the court has determined that Miller's speech may have deserved protection under the First Amendment, so the *Butler* decision is not on point.

cannot be liable for Kennard's allegedly unconstitutional acts because Kennard is not a policy maker for the County, and that Miller has failed to allege facts sufficient to constitute a custom or usage of unconstitutional retaliation in the Sheriff's Office.

### A. Was Kennard a Final Policy Maker?

#### 1. Salt Lake County's Admission Number 20

During discovery, Salt Lake County admitted that "Sheriff Kennard is Salt Lake County's final policy maker regarding employment decisions in the [Sheriff's Office]," and that "the Sheriff is a policy maker regarding transfers...." (See Pl.'s Mem. Opp'n Salt Lake County's Mot.Summ.J. Ex 40 at 4). United States Magistrate Judge Samuel Alba denied Salt Lake County's motion to withdraw the admission. This court denied defendants' motion to review Judge Alba's ruling. However, the admission is not itself determinative of the question. While the admission provides factual evidence supporting Miller's argument that Kennard is a policy maker, the ultimate determination of Kennard's status is a question of law to be determined by the court. See Randle v. City of Aurora, 69 F.3d 441, 447 (10th Cir.1995) (stating " 'final policymaking authority' is a legal issue to be determined by the court based on state and local law.") (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 124, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)).

#### 2. Standards for Municipal Liability

The Supreme Court has established that municipalities may be held liable as "persons" for constitutional violations under 42 U.S.C. § 1983, if the municipality enacts an unlawful policy or an official engages in unconstitutional acts that can be characterized as acts of the municipality itself. See Monell v. Dept. of Soc. Servs., 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The official must be responsible for establishing final

government policy respecting the decision before the municipality itself can be held liable. See Pembaur v. Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Identifying which officials are policy makers is a question of state law, and authority may be established through legislation or through delegation by an official with policy making power. See City of St. Louis v. Praprotnik, 485 U.S. 112, 124, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). "When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." Id. at 127, 108 S.Ct. 915.

The Tenth Circuit has identified three elements helpful in determining whether an official is a "final policy maker:" (1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decisions are subject to any meaningful review; and (3) whether the decision is within the realm of the official's grant of authority. See Randle v. City of Aurora, 69 F.3d 441, 448 (10th Cir.1995) (quoting Praprotnik, internal citations omitted). Review which relieves a municipality of liability for an official's unlawful acts cannot be merely hypothetical or illusory. See id. at 449 (finding that conflicting provisions in a city charter and in a personnel manual created issues of fact regarding the City Manager's status as a final policy maker).

#### 3. Kennard's Status as a Policy Maker

##### a. Utah Statutes

Utah law requires all counties over a certain population to establish a Merit Commission, composed of three appointed members. The members' duties include adopting policies and procedures to evaluate candidates for law enforcement jobs for the Sheriff's Office, establishing certain criteria for Sheriff's Office employment policies, and creating a hearing process for employees wishing to appeal cer-

tain employment decisions. *See* Utah Code Ann. §§ 17–30–3, 17–30–5, 17–30–18, 17–30–19.

However, the Merit System neither establishes meaningful constraints on a sheriff's discretion to transfer or investigate officers, nor creates a right to appeal these decisions. *See* Utah Code Ann. § 17–30–13 (allowing the Sheriff to transfer officers without formally reexamining their job qualifications); Utah Code Ann. § 17–30–18 (placing constraints on the Sheriff's decisions to demote, reduce the pay, suspend, or discharge officers); § 17–30–19 (establishing review of those decision without providing review for decisions to investigate or transfer officers); Utah Code Ann. § 17–30–22 (restricting transfers to reward or punish an officer's political activity,[6] without restricting the Sheriff's ability to make transfers as unconstitutional retaliation for protected speech).

b. *Salt Lake County's Merit Commission Policies*

Similarly, the Salt Lake County Merit Commission Policies relied upon by Salt Lake County are insufficient to establish as a matter of law that the policies restrict the Sheriff's discretion to transfer or investigate officers or that the Merit Commission exercises meaningful review over these decisions. Salt Lake County argues that policies numbered 1100, 4160, 6140, 7100, 7110, 7130 indicate that the Merit Commission constrains the Sheriff's discretion in ordering transfers and investigations. (*See* Salt Lake County's Mem.Supp. Summ.J.Ex. D (policy 1100), Ex. G (policy 6140), Ex. H (policy 7100), Ex. I (policy 7110), and Ex. F (policy 7130)) (the court

notes policy 4160 does not appear in any exhibit filed by Salt Lake County).

Policy 1100 broadly states that one goal of the Commission is "provision of a formal procedure for processing appeals and grievances of employees." (*Id.* Ex. D at 2.5). However, this statement of intent does not indicate whether these appeals and grievance procedures apply to officers who have been investigated or transferred by the Sheriff.

Policy 6140 states that "no person shall ... influence an employee's personnel status: including hire, promotion, transfer, compensation, suspension, demotion, or discharge, for any political purpose." (*Id.* Ex. G at 1.1). The policy references Utah Code Ann. § 17–30–22, which the court understands as a restriction on using personnel actions to punish or reward officers for their activities related to electoral campaigns. However, Kennard's decisions to transfer and investigate Miller were allegedly made for the unconstitutional purpose of retaliating against Miller for his testimony as an expert witness. This is not a "political purpose" within the meaning of Merit Commission policy 6140 or Utah Code Ann. § 17–30–22.

Policy 7100 establishes officers' right to appeal matters "pertaining to major discipline," but the enumerated personnel actions do not include transfers or investigations. (*Id.* Ex. H at 1.0).

Policy 7110 describes different types of grievances recognized by the Merit Commission, including "Working condition

---

**6.** In full, this statutory language states:

Any employee of a governmental unit or member of a governing body, or appointing authority, or peace officer who shall appoint, promote, transfer, demote, suspend, discharge or change the amount of compensation of any merit system officer or seek, aid or abet the appointment, promotion, transfer, demotion, suspension, discharge or change in the amount of compensation of any merit system officer, or promise or threaten to do so, for giving, withholding, or neglecting to make any contributions or any service for any political purpose, or who solicits, directly or indirectly, any such contribution or service, from a merit system officer, shall be guilty of a misdemeanor. Utah Code Ann. § 17–30–22(1). Clearly this language applies to electoral politics and prohibits the transfer of officers as a reward or punishment for their having contributed money or time to political activities.

grievances" related to "the interpretation of the personnel rules and regulations, practice and working conditions, such as performance evaluations...." (*Id.* Ex. I at 1.3–1.4). However, neither transfers nor investigations are enumerated as grounds for grievances, so this policy does not provide evidence that Sheriff Kennard's decisions regarding Miller were subject to meaningful review.

Policy 7130 establishes the process for conducting appeals before the Merit Commission, and states that once officers have exhausted their administrative remedies within the Sheriff's office, they may bring disciplinary action or working condition grievances to the Commission. (*Id.* Ex. F). However, nothing in the text of this policy clarifies whether or not transfers or investigations could be reviewed as a part of a disciplinary or working conditions grievance, and thus provides no evidence showing that Kennard's discretion was subject to meaningful review.

Since neither Utah law nor the Merit Commission policies submitted by Salt Lake County, on their face, demonstrate that Kennard is restricted in his ability to transfer or investigate officers or that these decisions are subject to meaningful review, the court cannot determine, as a matter of law, whether or not Kennard is a policy maker in these areas. The court will determine the question of Kennard's policy maker status at trial after a full presentation of the relevant evidence.

**B.** *Miller's Allegations of a Custom or Usage of Retaliatory Transfers*

 The Supreme Court has held that "a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108

S.Ct. 915, 99 L.Ed.2d 107 (1988) (internal citations omitted); *see also Lankford v. City of Hobart,* 73 F.3d 283, 286 (10th Cir.1996). For Salt Lake County to be held liable on the basis of custom, there must have been a pattern of "persistent and widespread" unconstitutional practices which became so "permanent and well settled" as to have the "effect and force of law." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 168, 90 S.Ct. 1598, 26 L.Ed.2d 142, (1970); *see also Monell v. Dept. of Soc. Services of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Lankford,* 73 F.3d at 286. To reach this level of custom, Miller must show that the custom was so widespread that the County had knowledge that it existed, and that the County's failure to correct it amounted to reckless or deliberate indifference. *See Gates v. Unified Sch. Dist. No. 449,* 996 F.2d 1035, 1042 (10th Cir.1993); *Woodward v. City of Worland,* 977 F.2d 1392, 1399 (10th Cir.1992) (noting that liability under § 1983 must be predicated upon a "deliberate deprivation of constitutional rights by a defendant").

Miller has submitted the affidavits of five current and former officers with the Salt Lake County Sheriff's Office, who claim Sheriff Kennard violated their constitutional rights by retaliating against them for activities protected by the First Amendment. Salt Lake County has moved for summary judgment on Miller's custom and usage claim because much of the evidence submitted by Miller is inadmissible and that Miller failed to meet his burden of submitting evidence sufficient to create an issue of material fact.

 After examining the affidavits, the court concludes that cumulatively it is insufficient to find, as a matter of law, that Salt Lake County had allowed a custom or usage of retaliation against conduct protected under the First Amendment because:

(1) Although Louis Bertram may have been terminated because he planned to run for office against Sheriff Kennard, Kennard's action is not a constitutional violation. *See Jantzen v. Hawkins,* 188 F.3d 1247, 1257–58 (10th Cir.1999) (finding that a Sheriff's decision to terminate an officer who stated he intended to run against him in the next election was constitutional under *Pickering,* because the Sheriff's need to enforce department loyalty outweighed the officer's right to state that he would run for office);

(2) Although Chris Bertram may have been given an undesirable transfer a year after his father ran against Kennard in the Sheriff election, this evidence is too remote in time from the election to allow the court to infer that the transfer is causally related to the election. *See Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (finding that a three-month period between the protected activity and alleged retaliation, without more evidence, is insufficient to establish causation);

(3) The evidence that Marc Peterson was transferred to West Patrol instead of Special Operations does not show retaliation, since Miller has not demonstrated that the two positions were significantly different in terms of desirability among the officers as a whole.

(4) While Miller's evidence regarding William Bills and Robert Bobrowski suggests that they may have suffered unlawful retaliation, these incidents, standing alone, are insufficient to establish a "persistent and widespread" unconstitutional practice which is so "permanent and well settled" as to have the "effect and force of law." *Monell,* 436 U.S. at 691, 98 S.Ct. 2018.

Consequently, Salt Lake County's motion for summary judgment on Miller's claim for unconstitutional custom and usage is granted.

C. *Salt Lake County's Liability for Bell's Alleged Unconstitutional Acts*

Miller has not submitted evidence supporting his argument that Undersheriff Bell is a policy maker for the Sheriff's Office, and it is evident that Bell's decisions are limited by policies approved by Sheriff Kennard and subject to review by the Sheriff. Furthermore, Miller has failed to demonstrate a custom or usage of unconstitutional retaliation. Therefore, if the court finds at trial that Bell violated Miller's constitutional rights, Salt Lake County is not liable for Bell's acts.

*Order*

1. Defendants Kennard's and Bell's motions for summary judgment based on qualified immunity are DENIED;

2. Defendant Kennard's motion for summary judgment for lack of causation is DENIED; and

3. Salt Lake County's motion for summary judgment on municipal liability is DENIED as it applies to acts of Sheriff Kennard, GRANTED as it applies to a custom and usage of the County, and GRANTED as it applies to acts of Undersheriff Bell.