Earl H. **BUSEY**, Jr., Plaintiff,

v.

**THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SHAWNEE, KANSAS, et al., Defendant.**

No. 01–4083–JAR.

United States District Court,
D. Kansas.

Aug. 15, 2003.

---

Jonathan B. Phelps, Topeka, KS, Margie J. Phelps, Topeka, KS, for Plaintiff.

Craig C. Blumreich, William A. Larson, Gehrt & Roberts, Chartered, Topeka, KS, David R. Cooper Fisher, Patterson, Sayler & Smith, Topeka, KS, for Defendant.

### MEMORANDUM ORDER AND OPINION PARTIALLY GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND REMANDING STATE LAW CLAIMS

ROBINSON, District Judge.

This matter is before the Court on two motions for summary judgment: that of defendants, Board of County Commissioners of the County of Shawnee, Kansas ("the County"), Sheriff Dick Barta ("Barta") and Dan Bryant ("Bryant") (Doc. 113); and that of defendant Richard Eckert, Shawnee County Counselor ("Eckert") (Doc. 115). Plaintiff Earl H. Busey, Jr., has responded, along with a Motion to Strike portions of the motion filed by the County, Barta and Bryant (Doc. 124). For the reasons set forth in detail below, the Court grants defendants' motions with respect to plaintiff's federal claims and remands the case to the District Court of Shawnee County, Kansas for further proceedings on plaintiff's remaining state law claims. Given the Court's order to remand, defendants' motions for summary judgment as to plaintiff's state law claims are denied without prejudice as moot.

### I. Motion to Strike

Busey has moved to strike a section of defendants' memorandum in support of summary judgment entitled "Nature of the Case." The Court will not consider these introductory paragraphs as statements of fact, because they do not cite to the record or otherwise conform to Rule 56 of local rules in this District. Busey's motion is denied as moot.

### II. Statement of Facts

The following facts are taken from the summary judgment record and are either stipulated, uncontroverted or viewed in the light most favorable to plaintiff's case. The Court ignores factual assertions that are immaterial, or not supported by affidavits and/or authenticated and admissible documents. The Court also disregards conclusory statements and statements that are conclusions of law rather than statements of fact.

Busey joined the Shawnee County Sheriff's Department in 1980. He worked in the jail for two years, then moved to the patrol unit, where he worked until 1996. In 1996, he moved to the special services/narcotics unit. Busey supervised other deputies and interdiction officers in the narcotics unit. He reported to Lieutenant Larry Crady, who reported to

Captain Richard Hladky, who reported to Major Ken Pierce. Busey consistently received positive performance evaluations throughout his career with the Sheriff's Department.

Defendant Bryant was a captain in the Shawnee County Sheriff's Department until his retirement in April 2001. Bryant was Captain in charge of the narcotics unit from August 1998 to January 2000. Dave Meneley was Sheriff of Shawnee County from 1993 to 2000. He was removed from office on February 24, 2000, following an ouster proceeding after criminal charges were brought alleging, in part, that he had concealed theft of drug evidence by sheriff's deputies.

In September 1996, Busey's wife Debbie contacted Sergeant Dave Reser, a friend of Busey's. According to Reser's written report, she advised him that Busey was "going Signal 4," law enforcement code for a threatened suicide, and asked Reser to talk to Busey. Reser and Richard Grassi, another deputy, went to see Busey, who was at home. Reser and Grassi each made a written report of the incident.

Reser's report describes his initial contact with Debbie Busey, stating that Debbie Busey called Reser and was "crying and hysterical." She said that she and Busey were having marital problems and that she was leaving Busey. Grassi's report describes his and Reser's meeting with Debbie Busey in a park near the Busey home. The report states that Debbie described Busey as "irate" and that Busey "allegedly told Debbie to call us (the department); that he had enough guns and ammunition to take some of us with him." Grassi's report states that Busey answered the door and said, "I ain't comin' out. You ain't comin' in. And if you do, I'll stuff it in your f* * *in' ass," then shut the door. Debbie returned home shortly thereafter and took Busey to Parkview Hospital to see Dr. Levy, a psychiatrist.

While on her way home, Dr. Levy called Debbie to tell her to come pick Busey up, as he was merely trying to manipulate her.

Busey spoke to then Sheriff Meneley about the incident. Meneley indicated he would take no action against Busey. The parties dispute whether Meneley required Busey to undergo a psychiatric evaluation after the incident.

In or around November 1999, while still in office, Meneley asked Busey to locate and interview Lisa Gordon, a private citizen, regarding allegations that she used drugs with sheriff's deputy Scott Holladay. Lt. Crady was present when the request was made. Meneley did not give Busey any documentation about the investigation, nor did Busey assign a case number to the investigation. Busey was unable to locate Gordon and let the matter lapse for several months. Prior to the year 2000, Busey had never investigated a fellow officer.

Busey was called to testify in the ouster proceedings against Meneley. His identity was protected because of his narcotics work, and his testimony included discussion of the work done in the narcotics division. During the ouster proceedings, there was a great deal of discussion within the Sheriff's Department about who had been called to testify. Busey was not involved in any of the events related to misuse of drug evidence, nor was he accused of misconduct as part of the events leading to Meneley's ouster.

In February 2000, Richard Barta was appointed by Governor Bill Graves to fill the position of sheriff left vacant after Meneley's ouster. Later in 2000, Barta ran for the sheriff's office against Meneley in the primaries, and won. Barta testified that he accepted the appointment because he wanted to take away the stigma on the department, which was also part of his campaign when he ran for office later that year.

Busey testified that immediately following Meneley's ouster, guards were placed temporarily in the sheriff's department, the door locks were changed, there was a delay in getting a new key to the door, negative rumors were circulating about the narcotics unit, the narcotics buy fund was audited, and coworkers acted unfriendly. Busey also suspected that someone went through the contents of his desk. Within three weeks of taking office, Barta told Captain Hladky that Busey and Lt. Crady needed to be removed from narcotics.

Some time after Meneley's ouster, Busey reported to Crady that he could not find Lisa Gordon. Crady located an address and he and Busey went to Gordon's home on April 18, 2000. Crady interviewed Gordon for 10 to 15 minutes. Busey and Crady went immediately to a private home where Meneley was located. Busey and Crady reported the results of the interview to Meneley. Busey testified that he advised Meneley of the outcome of the interview as a courtesy pursuant to an informal practice of letting people who gave tips know the outcome if nothing came of it.

On April 19, 2000, Sheriff Barta received a citizen complaint from Gordon, who alleged Busey and Crady were conducting a "witch hunt," and trying to pressure her into admitting using drugs with Holladay. On April 21, 2000, Sheriff Barta received a call from deputy Holladay, who asked Barta if Holladay was being investigated. Sheriff Barta testified that although he was aware of allegations that Holladay was a drug user, he was not aware of any investigation of Holladay, nor had he authorized any such investigation.

The written reports of Reser and Grassi detailing the September 1996 incident with Busey were found in non-personnel files left by Meneley in his office. Major Pierce and Bryant showed the reports to Sheriff Barta. A note dated April 20, 2000, from Bryant to Barta, asked Barta to review the files "to see if you think this may be a good way to urge Earl Busey to leave or get a psyc. eval."

On April 24, 2000, Sheriff Barta asked Dan Breci of the Topeka Police Department to investigate Busey's involvement in the interview of Gordon. Breci interviewed Gordon, Busey, Crady and Hladky, and prepared a written report of his investigation. Busey admitted that he interviewed Gordon and that he and Crady had talked to Meneley at Brokaw's house about the interview. Busey stated that he "did not have a clue" about whether Meneley would benefit from the information and that he had "no idea" if deputy Holladay was considered a witness against Meneley.

Sheriff Barta tentatively concluded that Busey's involvement in the Gordon interview violated Section 42.5.5 of the Fraternal Order of Police (FOP) Contract, which provides that receipt of allegations of misconduct by a bargaining unit member must be reported to the chief steward, and General Order 87–006 of the Sheriff's Department, which prohibits communication of confidential information to anyone inside or outside the department. Sheriff Barta placed Busey on administrative leave without pay pending further evaluation of the matter. Lt. Crady was also placed on administrative leave, and retired immediately thereafter.

On May 3, 2000, an article appeared in the Topeka Capital–Journal reporting that Busey was placed on administrative leave without pay following an internal affairs investigation. The article quoted Eckert as saying placing Busey and Crady on administrative leave "does have to do with the sheriff's department drug scandal, but until we get the investigation done, I don't want to say anything."

On May 6, 2000, an article appeared in the Topeka Capital–Journal, in which Ec-

kert was quoted as wanting to make clear that Busey and Crady were not being accused of stealing cocaine, other drugs, or money. The article stated that "Busey and Crady were placed on administrative leave based on a 'chain of command problem' which was 'somewhat related to the ouster' and the sheriff's department drug scandal, said Eckert, who declined to elaborate."

Sheriff Barta conveyed to Busey that Busey must undergo a psychological evaluation prior to returning to duty, because of the domestic dispute with Debbie Busey in 1996. On May 17, 2000, Busey called Sheriff Barta to ask if Barta would waive the two-week notice period so that Busey could retire effective May 19, 2000, stating that he "wasn't going to play the game any longer." Notes from Barta reflect that during the conversation Busey said "this is bull-shit. Digging up shit that happened 4 years ago; after that incident I received 12 months of counseling from a shrink" and "I don't want to retire but I'm being forced out" and "you're are [sic] getting what you want." Barta agreed, and Busey submitted a letter memorializing Busey's decision to retire effective May 19, 2000.

On May 17, 2000, an article appeared in the Topeka Capital–Journal reporting that Busey retired effective May 19, 2000, "as a result of the department's drug scandal." The article again stated that Busey had not been accused of stealing cocaine or other drugs or money, and that Busey was the sixth sheriff's officer to leave the department since the drug scandal became public.

Busey testified that he had no political involvement with Meneley or his campaigns for sheriff, although Debbie Busey put up yard signs on Meneley's behalf. Busey testified that his only relationship with Meneley was through work.

Busey filed suit in state court on May 31, 2001. The case was thereafter removed to federal court (Doc. 1).

### III. Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[1] The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[2] Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[3]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case.[4] Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial.[5] "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts

1. Fed.R.Civ.P. 56(c).

2. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

3. Id. at 251–52, 106 S.Ct. 2505.

4. See Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

5. See Anderson, 477 U.S. at 256, 106 S.Ct. 2505.

showing that there is a genuine issue for trial." [6] Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.[7] The court must consider the record in the light most favorable to the nonmoving party.[8]

The court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." [9]

## IV. Discussion

### A. First Amendment Violations

Busey contends that he suffered adverse employment action by defendants on the basis of his political association with Meneley and his activity in interviewing Gordon about the alleged drug use of fellow deputy Holladay. Busey fashions four separate § 1983 claims from these underlying facts: 1) constructive discharge; 2) retaliatory discharge; 3) termination based on association in violation of his First Amendment rights; and 4) termination based on other protected activity in violation of his First Amendment rights. Busey brings these claims against the County and against Sheriff Barta, Bryant, and Eckert in their individual and official capacities.

Defendants contend that summary judgment is appropriate because Busey has failed to establish a constitutional violation. Specifically, defendants argue that Busey's association with Meneley and interview of Gordon are not constitutionally protected and, even if they were protected, the Sheriff's Department's interest in maintaining an efficient and effective workplace outweighed Busey's right to associate with Meneley and interview Gordon regarding Holladay's alleged drug use. Defendants also contend that Busey's association with Meneley was not a substantial factor in his being placed on administrative leave and that even absent his association, he would have been placed on leave for failing to follow Sheriff Department procedures. The individual defendants contend that they are entitled to qualified immunity on the additional ground that Busey has failed to establish that their actions violated a law that was clearly established. The County argues that it cannot be held liable unless Busey can establish the County had an unconstitutional custom, policy or practice which caused his injury. In response, Busey contends that the County can be held liable for the results of decisions made by a final policymaker, as defined by state law, and argue that Sheriff Barta and/or Eckert are the final decision makers for purposes of the County's liability under § 1983. The Court will address these issues in turn.

### 1. Freedom of Speech

Busey contends that his participation in the interview of Lisa Gordon is "protected activity." Busey does not, however, provide any support for this claim, nor does he point to any particular *statement* that he made, other than his statement to Meneley about the interview with Gordon. Busey's interview of Gordon is not exactly "speech," but lacking a more apt label, the Court will analyze it as such.

Although it is axiomatic that an employer may not discharge a public employee in

---

6. *Id.*

7. *See id.*

8. *See Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985).

9. *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

retaliation for the employee's exercise of his or her First Amendment right to freedom of speech, that right is not absolute.[10] In analyzing whether a public employer's action impermissibly infringes on free speech rights, the Supreme Court has explained that "[t]he problem in any case is to arrive at a balance between the interests of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[11] Under the so-called *Pickering* balancing test, the Tenth Circuit has explained that the court must ask the following questions:

1. Whether the speech in question involves a matter of public concern.

2. If so, [the court] must weigh the employee's interest in the expression against the government employer's interest in regulating the speech of its employees so that it can carry on an efficient and effective workplace.

3. Employee must show the speech was a substantial factor in driving the challenged government action.

4. If so, can the employer show that it would have taken the same employment action against the employee even in the absence of the protected speech.[12]

▮▮▮▮ The first two questions present legal issues to be resolved by the court, while the final two present questions of fact to be resolved by the jury.[13]

### a. Matter of public concern

▮▮ If an employee speaks on a matter of public concern, the speech is protected by the First Amendment.[14] If an employee speaks "as an employee upon matters only of personal interest," the speech is not protected.[15] A statement "is characterized as a matter of public concern and not merely a personal employment grievance if it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'"[16] To determine whether "particular speech relates merely to internal workplace issues, courts must conduct a case by case inquiry, looking to the 'content, form and context' of the speech,"[17] "which includes scrutinizing whether the speaker's purpose was to bring an issue to the public's attention or to air a personal grievance."[18] "An employee's speech must not merely relate generally to a subject matter that is of public interest, but must 'sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government.'"[19] In other words, the court

10. *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

11. *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

12. *Kent v. Martin,* 252 F.3d 1141, 1143 (10th Cir.2001) (citing *Barker v. City of Del City,* 215 F.3d 1134, 1137 (10th Cir.2000)) (quoting *Jantzen v. Hawkins,* 188 F.3d 1247, 1257 (10th Cir.1999)).

13. *Id. See also Prager v. LaFaver,* 180 F.3d 1185, 1190 (10th Cir.), *cert. denied* 528 U.S. 967, 120 S.Ct. 405, 145 L.Ed.2d 315 (1999); *Hogan v. City of Independence, Kansas,* 2003 WL 21685907, *6 (D.Kan. July 11, 2003).

14. *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

15. *Id.*

16. *Moore v. City of Wynnewood,* 57 F.3d 924, 932 (10th Cir.1995) (quoting *Connick,* 461 U.S. at 146, 103 S.Ct. 1684).

17. *Id.* (quoting *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684).

18. *Id.* (citing *McEvoy v. Shoemaker,* 882 F.2d 463, 466 (10th Cir.1989)).

19. *Id.* (quoting *Wilson v. City of Littleton, Colo.,* 732 F.2d 765, 768 (10th Cir.1984)); *see also Koch v. City of Hutchinson,* 847 F.2d

"should look beyond the general topic of the speech to evaluate more specifically what was said on the topic." [20]

■ Defendants contend that Busey's interview of Gordon, at the direction of ousted former sheriff Meneley, was nothing more than the pursuit of a hidden personal agenda and did not touch upon matters of public concern. The Tenth Circuit has explained that "[i]n drawing the thin line between a public employee's speech which touches on matters of public concern, and speech from the same employee which only deals with personal employment matters, we have looked to the subjective intent of the speaker." [21] Even assuming the subject matter of Busey's interview with Gordon, the allegations of drug use by a deputy, touched on a matter of public concern, Busey's evidence is insufficient to demonstrate protected speech under the First Amendment. "In order for a public employee's speech to be of public concern, . . . it is not always enough that its *subject matter* could in [certain] circumstances, [be] the topic of a communication to the public that might be of general interest. What is *actually said* on the topic must itself be of public concern." [22] Here, Busey has not presented evidence of anything that he *actually said* while interviewing Gordon or reporting to Meneley. Thus, Busey cannot rely on his interview of Gordon to support his free speech claim on this ground. [23]

#### b. *Weighing of interests*

Assuming that Busey's interview of Gordon involved a matter of public concern, the Court proceeds to the second step of the inquiry: whether Busey's interest, "as a citizen, in commenting upon matters of public concern" outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." [24] Relevant considerations include: "whether the [employee's speech] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." [25]

Defendants correctly point out that the Tenth Circuit has acknowledged that police departments have a "heightened interest . . . in maintaining discipline and harmony among employees." [26] In this case, defendants contend that the county sheriff cannot provide effective public service while his deputies conduct secret investigations of fellow deputies on the basis of "a

---

1436, 1445–47 (10th Cir.) (en banc) (reaffirming *Wilson* ), *cert. denied*, 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988).

**20.** *Id.*

**21.** *Schalk v. Gallemore*, 906 F.2d 491, 495 (10th Cir.1990).

**22.** *Koch v. City of Hutchinson*, 847 F.2d 1436, 1445 (10th Cir.1988) (en banc) (internal quotation marks omitted; brackets in the original; second emphasis added).

**23.** *See Lunow v. City of Oklahoma City*, 2003 WL 1605863 (10th Cir. March 28, 2003) (same).

**24.** *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731.

**25.** *Rankin v. McPherson*, 483 U.S. at 388, 107 S.Ct. 2891 (citing *Pickering*, 391 U.S. at 570–73, 88 S.Ct. 1731).

**26.** *Moore*, 57 F.3d at 934 (quoting *Wulf v. City of Wichita*, 883 F.2d 842, 861 (10th Cir. 1989)); *see also Kelley v. Johnson*, 425 U.S. 238, 246–47, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976) (recognizing the need to accord police departments wide latitude in decisions that impact "discipline, esprit de corps, and uniformity").

personal agenda sparked by loyalty to an ousted former sheriff."

■ In balancing the employee's interest in expression against the government's interest in efficiency, a court must consider "the manner, time, and place of the employee's expression," as well as the events leading up to it.[27] Additionally, an employee's responsibilities in the workplace are relevant to the *Pickering* balancing.[28] "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails."[29]

■ There are several important aspects of Busey's speech that diminish his interests under the *Pickering* inquiry. In considering the time, place, and manner of the disputed speech, the Tenth Circuit has considered whether the employee used "less disruptive internal channels, rather than going outside the city administration."[30] By Busey's own account, before he spoke to Meneley, he had not discussed the interview with Gordon with Sheriff Barta or any of his superiors in the sheriff's department, and he has offered no justification for his failure to do so. Further, Busey's conduct suggests that he concealed rather than expressed his interview with Gordon about the suspected

drug use of deputy Holladay. Busey did not make a written report and was equivocal on his communication with Meneley when questioned by Officer Breci. As the Supreme Court has noted, "[t]he burden of caution [an employee] bear[s] with respect to the words [he] speak[s]" varies with his job responsibilities.[31] Busey's responsibilities as a sheriff's officer called for "a degree of caution that he failed to exercise."[32] The Court therefore concludes that Busey's failure to pursue his suspicions or concerns about deputy Holladay internally indicates that his speech was "unnecessarily disruptive."[33] That conclusion diminishes the weight afforded Busey's interest in the *Pickering* balancing.[34]

Having concluded that Busey's interests are significantly diminished by his failure to pursue his concerns within the Sheriff Department, the Court considers the interests of his employer. The Court notes that Busey's investigation of deputy Holladay was unauthorized and, by interviewing Gordon about Holladay's alleged drug use, Busey appears to have breached FOP rules requiring receipt of allegations of misconduct of fellow officers to be reported to the chief steward. Further, by speaking with Meneley about his interview with Gordon, Busey appears to have breached general Department confidential-

---

27. *Lytle v. City of Haysville, Kan.,* 138 F.3d 857, 863–64 (10th Cir.1998) (quoting *Rankin,* 483 U.S. at 388, 107 S.Ct. 2891).

28. *Id.*

29. *Rankin,* 483 U.S. at 390, 107 S.Ct. 2891.

30. *Lytle,* 138 F.3d at 865 (citing *Conaway v. Smith,* 853 F.2d 789, 798 (10th Cir.1988)); *see also Johnsen v. Independent School. Dist. No. 3,* 891 F.2d 1485, 1494 (10th Cir.1989) (noting that the court should consider whether the employee "used internal complaint procedures" and finding that the "[p]laintiff's decision to contact outside agencies prior to using the complaint mechanism of the school

was unnecessarily disruptive because there was no indication that the internal mechanism would not be sufficient.").

31. *Rankin,* 483 U.S. at 390, 107 S.Ct. 2891.

32. *Lytle,* 138 F.3d at 866.

33. *Id.* at 865 (quoting *Johnsen,* 891 F.2d at 1494).

34. *Cf. Hogan v. City of Independence, Kan.,* 2003 WL 21685907, *11 (distinguishing *Lytle* where police officer did not go outside the law enforcement community and publicly attempt to expose the police chief for suspected criminal activity).

ity rules against discussing such matters with persons outside the Department. The Tenth Circuit has recognized the importance of confidentiality to the performance of police officers' responsibilities. "Any breach of confidentiality ... reflects negatively on an officer's ability and competence to perform his job, and each officer's competence affects the overall effectiveness of the department." [35] Moreover, personal loyalty and confidence are especially important among police officers, who are charged with ensuring public safety and who often must work together in life-and-death situations. [36]

██ Defendants allege that Busey's investigation of a fellow deputy at the direction of the recently ousted former sheriff had the "potential to cause havoc in the sheriff's department." It is significant that Busey has failed to address the second *Pickering* factor in his response to defendants' motion for summary judgment. Instead, Busey disputes that Sheriff Barta concluded that Busey had *actually* violated Department policy, because he testified that he had not made a final conclusion when he placed Busey on administrative leave. However, Sheriff Barta's deferral of a final decision pending further investigation of Busey's actions does not diminish the weight the Court affords these effects in the *Pickering* inquiry. [37] In weighing the government employer's interests, the primary consideration is the impact of the disputed speech "on the effective functioning of the public employer's enterprise." [38]

As the Tenth Circuit has noted, its decisions "recognize that there is often a close connection between a police department's confidentiality rules and the morale and effective functioning of the police force." [39] When he placed Busey on administrative leave, Sheriff Barta had considered the reporting and confidentiality rules, and the effects on efficiency in the Sheriff's Department were foreseeable results of Busey's violation of those rules.

For the foregoing reasons, the Court believes that the *Pickering* balancing tips in the defendants' favor. Busey's limited interests are far outweighed by the Department's interest in maintaining confidentiality and avoiding workplace disruption. Because the Court concludes that there was no First Amendment violation on the protected activity/speech claim, there is no need to consider the remaining *Pickering* factors. Accordingly, summary judgment is granted on this issue.

### 3. Freedom of Association

The Supreme Court has recognized two types of association protected by the First Amendment: 1) intimate relationships; and 2) expressive relationships-associations for the purpose of engaging in protected activities, e.g., speech, assembly, redress of grievances and exercise of religion. [40]

There is no allegation that Busey's right to "intimate association" was impaired-he admits that he had no social relationship

---

**35.** *Melton v. City of Oklahoma City*, 879 F.2d 706, 715 (10th Cir.1989), *overruled on other grounds*, 928 F.2d 920 (10th Cir.1991) (en banc).

**36.** *Lytle*, 138 F.3d at 866 (citing *Moore*, 57 F.3d at 934) (the "need [for workplace harmony] is particularly acute in the context of law enforcement, where there is a 'heightened interest ... in maintaining discipline and harmony among employees.' ") (quoting *Wulf v. City of Wichita*, 883 F.2d at 861).

**37.** *Id.*

**38.** *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891.

**39.** *Lytle*, 138 F.3d at 868 (citing *Melton*, 879 F.2d at 714).

**40.** *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

with Meneley, and that his only relationship to him was through work. Further, Busey's association with Meneley does not fit into the traditional notion of a political party association-he admits that he had no political involvement with Meneley or his past campaign for sheriff. Instead, Busey characterizes his claim as being identified and perceived as a person with political loyalty to Meneley. The Court will thus begin its analysis of Busey's claim as a so-called "political patronage" case.

 "The First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation, unless their work requires political allegiance."[41] To defeat a properly supported motion for summary judgment against a political discrimination claim, a plaintiff must establish a genuine dispute of fact that (1) political affiliation and/or beliefs were "substantial" or "motivating" factors behind the adverse employment action; and (2) the employment position did not require political allegiance.[42] The burden of proof rests with plaintiff on the first issue and with defendant on the second.[43] Once the plaintiff proves political patronage was a motivating factor behind his dismissal, the burden shifts to the defendant to prove that the discharge would have occurred regardless of any discriminatory political motivation.[44] In this case, defendants do not allege that Busey was in a policy-making position or one that would require confidentiality. Instead, de-

fendants argue that Busey's association with Meneley was not political and therefore not protected by the First Amendment.

Under the first prong, Busey contends that by identifying him as a person who had political loyalty to Meneley, the defendants targeted him for adverse employment action in violation of his right to freedom of association. Defendants argue that the political patronage cases cited by Busey do not apply, citing in support Busey's deposition testimony that he had never supported Meneley politically or in his past campaigns. A review of political patronage cases will help shed light on this issue.

In *Elrod v. Burns,*[45] Republican employees of the sheriff's department were fired or faced threats of discharge from the newly appointed Democratic sheriff solely because the employees were not affiliated with or sponsored by the Democratic Party. Specifically, the employees were asked to pledge political allegiance to the "proper" party, work for political candidates, financially support the party, or obtain sponsorship of a member of the party in order to keep their jobs.[46] The Supreme Court held that discharge of public employees based on political patronage of this sort violated the First and Fourteenth Amendments.[47]

In *Branti v. Finkel,*[48] the newly-appointed Democratic public defender fired two

**41.** *Mason v. Oklahoma Turnpike Authority,* 115 F.3d 1442, 1451 (10th Cir.1997) (quoting *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 68–69, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)).

**42.** *See Jantzen v. Hawkins,* 188 F.3d at 1251.

**43.** *See Dickeson v. Quarberg,* 844 F.2d 1435, 1441 (10th Cir.1988).

**44.** *Mason,* 115 F.3d at 1452 (citing *Gardetto v. Mason,* 100 F.3d 803, 811 (10th Cir.1996));

*see also Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568 (the "Mt. Healthy defense").

**45.** 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

**46.** *Id.* at 355, 96 S.Ct. 2673.

**47.** *Id.* at 373, 96 S.Ct. 2673.

**48.** 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

assistant public defenders who were Republicans based solely on their political beliefs. The Supreme Court held that dismissed employees need not prove they were forced to change political beliefs or lose their jobs, as was the case in *Elrod.* Instead, the Court concluded it was sufficient to prove discharge "solely for the reason that they were not affiliated with or sponsored by the Democratic Party." [49]

In *Rutan v. Republican Party of Illinois*,[50] low level public employees complained of the governor's imposition of a hiring freeze, which in effect required his personal permission to hire, fire or transfer any state employee. In deciding whether to grant such permission, the Republican governor looked at whether the individual voted in recent Republican primaries, provided financial support to the Republican Party and its candidates, whether the individual promised to join and work for the Republican Party in the future, and whether the individual had the sponsorship of any current member of the Republican Party.[51] The plaintiffs claimed they suffered adverse effects of the freeze because they were not supporters of the Republican Party. The Supreme Court held that the rule of *Elrod* and *Branti* extends beyond termination to promotion, transfer and hiring decisions based on party affiliation and support.[52]

In *Jantzen v. Hawkins*,[53] a deputy sheriff was fired because he decided to run against the incumbent sheriff. Two other deputies and a jailer were fired for supporting the deputy by putting up signs, making phone calls, campaigning door-to-door and providing financial support. The political association claim of the deputy who ran for office was rejected on the basis that the First Amendment does not protect political association with oneself. The association claims of the other deputies and the jailer were allowed to go to a jury because there was a genuine dispute of material fact as to whether they were fired based on their affiliation with the deputy who ran against the sheriff.[54]

In *Bass v. Richards*,[55] a reserve deputy was stripped of his commission for privately supporting the sheriff's opponent in an election. Although plaintiff did not publicly campaign for the opponent, he did articulate that he preferred the opponent's political philosophy to the incumbent sheriff's. After plaintiff was suspended, he considered running for sheriff himself, but deferred to the incumbent sheriff's opponent, whom he supported and who lost. Applying *Elrod* and *Branti*, the Tenth Circuit held that the plaintiff suffered an adverse employment action because his political alignment and beliefs were at odds with his employer's.[56] The court stated that it was sufficient that plaintiff was fired for failing to change his personal belief that an individual with the opponent's political philosophy would make a better sheriff than the incumbent.[57]

These political patronage cases clearly state that the First Amendment protects a public employee from adverse employment action based on party affiliation and support as well as failing to endorse or pledge allegiance to a particular political ideology. The facts of these

---

49. *Id.* at 517, 100 S.Ct. 1287 (quoting *Elrod*, 427 U.S. at 350, 96 S.Ct. 2673).

50. 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).

51. *Id.* at 66, 110 S.Ct. 2729.

52. *Id.* at 79, 110 S.Ct. 2729.

53. 188 F.3d 1247 (10th Cir.1999).

54. *Id.* at 1252.

55. 308 F.3d 1081 (10th Cir.2002).

56. *Id.* at 1091.

57. *Id.*

cases, however, are significantly different from the facts in this case. Although *Bass* and *Jantzen* indicate the right of political association need not be tied to party loyalty, those cases involved public employees who actively campaigned for or supported a particular candidate in a political contest. In these cases, the employee's political support of the defendant's political rival raised the concern that the employee's termination was based on the employee's political loyalties. By contrast, the record in this case reveals no evidence regarding the political motivation of defendants' employment action against Busey. Even assuming that defendants' adverse employment action was motivated by Busey's loyalty to Meneley, to rise to the level of a First Amendment violation, the defendant's adverse employment action must be motivated by *political* loyalty. Busey's loyalty to Meneley does not appear to represent the kind of political loyalty that the First Amendment protects.[58]

In this case, Busey fails to allege any political act of association with Meneley. There was no campaign and no election. Busey does not allege that his politics, his ideology, or his advocacy of political goals led to his allegedly forced retirement. The record is silent as to whether Busey had any partisan affiliation or espoused any political views. It does not say if, or how, Busey's affiliations or views differed from those of Sheriff Barta. In essence, Busey does not claim that defendants discriminated against him on the basis of his *actual* loyalty to a political party, political candidate or political beliefs or advocacy of ideas. Rather, he asserts only that defendants *perceived* him to be politically loyal to former sheriff Meneley.

Busey does not cite any authority in support of his claim that a perceived political loyalty is a protected act of association. The First Circuit addressed a similar issue in *Correa–Martinez v. Arrillaga–Belendez.*[59] In that case, plaintiff was an administrative employee in the judicial system, who brought action against three judges alleging that he had been forced to resign because of his close relationship with the former administrative judge with whom defendants had personal and political differences. Plaintiff did not claim that defendants discriminated against him on the basis of his political beliefs or advocacy of ideas, but only that defendants had political differences with an unrelated individual, the former judge.[60] While recognizing that various relationships have been sheltered under the "capacious constitutional tent of freedom of association," the court stated:

> Nevertheless, it is clear that, in constitutional terms, freedom of association is not to be defined unreservedly. Entry into the constitutional orbit requires more than a mere relationship. The Constitution may be interposed as a barrier to state action only to the extent that the targeted association is characterizable in terms of some particular constitutional concern. **Put another way, the first amendment does not protect against all deprivations arising out of an act of association unless the act itself-say, joining a church or a political party, speaking out on matters of public interest, advocacy or reform-falls within the scope of activities eligible for inclusion within the constitutional tent.**[61]

---

**58.** *Correa v. Fischer*, 982 F.2d 931, 935 (5th Cir.1993) ("The First Amendment protects an employee's loyalty towards a political party, a candidate or belief, but not a personal rival.")

**59.** 903 F.2d 49 (1st Cir.1990).

**60.** *Id.* at 57.

**61.** *Id.* (citation omitted) (emphasis added).

The court went on to conclude that plaintiff's claim did not state that plaintiff possessed or expressed any political views, did not set forth facts regarding the political contours of plaintiff's relationship with the judge, or that defendants knew anything about plaintiff's politics. Plaintiff's claim that "politics was in the air" between defendants and the judge, without more, provided no basis for a reasonable inference that defendants' employment decisions about plaintiff were motivated by their disregard for plaintiff's first amendment rights.[62]

Analyzed in this light, Busey's claim is vulnerable to a motion for summary judgment. The record does not say that Busey expressed, or possessed, any political views; indeed, Busey's testimony indicates that he avoided political involvement with Meneley at all. There was nothing inherently political about Busey's relationship with the former sheriff. The record contains no facts regarding the political contours, if any, of Busey's relationship with Meneley. There was no campaign and no election, nor was there evidence that Busey was aware that Meneley would run against Barta for sheriff later that year.

Busey makes the bald assertion, without support in the record, that the ouster of Meneley for criminal wrongdoing was politically motivated. However, such a "politically charged atmosphere," without more, does not provide a reasonable inference that defendants' employment decisions about Busey were tainted by their disregard of his first amendment rights.[63]

"Merely juxtaposing a protected characteristic—someone else's politics—with the fact that plaintiff was treated unfairly is not enough to state a constitutional claim."[64] In order to survive summary judgment, Busey must make a showing that a causal connection exists linking defendants' adverse employment decision to Busey's politics—that is, Busey must demonstrate that he was subjected to discrimination based on *his* political loyalty, affiliation or views.[65] Merely alleging that he had an undefined association with a politically controversial third party falls short of this requirement.

This raises a second issue: does the fact that Busey's association with Meneley lacks political patronage status foreclose constitutional protection? Defendants contend that since Busey's association does not amount to political association as contemplated by *Elrod, Branti* and *Bass*, the Court should apply the *Pickering* public concern test developed in the free speech context to Busey's freedom of association claim.[66] Busey does not respond to defendants' arguments or address whether this analysis is appropriate. Because the Court agrees that Busey's claim does not constitute a political patronage claim, it will address this issue.

The Tenth Circuit has observed that "courts are split as to whether the *Pickering* analysis applies to freedom of association claims."[67] In *Balton v. City of Milwaukee*,[68] the Seventh Circuit noted that application of the *Pickering* analysis may depend on whether the claim is one of

---

62. *Id.* at 58.

63. *Id.*

64. *Id.*

65. *Id.*

66. *Pickering*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811.

67. *Torres v. Pueblo Bd. of County Comm'rs,* 229 F.3d 1165, 2000 WL 1346347 (10th Cir.2000)(unpublished decision) (citing *Balton v. City of Milwaukee,* 133 F.3d 1036, 1039–40 (7th Cir.1998)); *Gregorich v. Lund,* 54 F.3d 410, 414 n. 4 (7th Cir.1995).

68. 133 F.3d 1036 (7th Cir.1998) (Cudahy, J., concurring).

"pure" freedom of association or "hybrid" freedom of association and freedom of speech.[69] Although the Tenth Circuit has not expressly decided the issue, in *Schalk v. Gallemore*,[70] the court applied the public concern test to identical free speech/free association claims in the context of that case, recognizing that the public concern test "may be an inapt tool of analysis" in other public employee free association contexts.[71] In *Schalk*, plaintiff was a hospital worker who was prohibited by her employer from expressing complaints over hospital matters to Board of Trustees. Plaintiff communicated her concerns to a board member, and was discharged. The court held that the "association" sought by plaintiff was "nothing more nor less than an audience for her speech," and thus collapsed into the analysis regarding her right to free speech.[72]

In this case, Busey's freedom of speech and freedom of association claims, though not identical as in *Schalk*, are closely related-Busey's association with Meneley consisted of the allegedly protected act of interviewing Gordon about deputy Holladay's purported drug use. As a result, the Court finds that the application of the public concern test to Busey's freedom of association claim would not be inappropriate in this case.[73]

■ The initial inquiry in the Court's analysis is whether Busey's association with Meneley touched upon matters of public concern. According to the Supreme Court, individuals have "a right to associate for the purpose of engaging in those activities protected by the First Amendment-speech, assembly, petition for redress of grievances, and the exercise of religion."[74] Here, Busey associated with Meneley to conduct the interview of Gordon about deputy Holladay. Because the Court has already determined that Busey's interview of Gordon did not satisfy the public concern requirement, supra, the Court holds that Busey's act of association with Meneley does not meet the public concern requirement either.

■ Even assuming Busey's association with Meneley was a matter of public concern, the Court finds that Busey's association with Meneley does not outweigh defendants' interest in maintaining discipline and harmony among co-workers. The Court has concluded that Busey's failure to pursue his suspicions about deputy Holladay internally significantly diminishes any interest he might have. In that same vein, the Court concludes that Busey's association with Meneley after the ouster regarding confidential matters is outweighed by the potential detrimental impact on the sheriff's department. As with Busey's freedom of speech claim, the *Pickering* balance weighs heavily against the interests of Busey.

In sum, the Court finds that Busey's association with Meneley is not protected by the First Amendment under the political patronage analysis nor the *Pickering* public interest analysis. Accordingly, summary judgment is granted on this issue.

**69.** *Id.* at 1041.

**70.** 906 F.2d 491 (10th Cir.1990).

**71.** *Id.* at 498 n. 6 (citing *Flanagan v. Munger*, 890 F.2d 1557, 1564 n. 7 (10th Cir.1989)) (expressing doubt regarding applicability of "public concern" analysis to freedom of association claims).

**72.** *Id.*

**73.** *See Beach v. City of Olathe*, 185 F.Supp.2d 1229, 1236 n. 2 (D.Kan.2002) (applying *Pickering* to freedom of association claim that was closely related to plaintiff's freedom of speech claim).

**74.** *Roberts v. U.S. Jaycees*, 468 U.S. at 618, 104 S.Ct. 3244.

## B. Section 1985 Conspiracy Claim

■ The elements of a § 1985(3) claim are: 1) a conspiracy; 2) to deprive plaintiff of equal protection or equal privileges and immunities; 3) an act in furtherance of the conspiracy; and 4) an injury or deprivation resulting therefrom.[75]

■ A valid claim under § 1985 must allege that the defendants' conduct was motivated by class-based or racially discriminatory animus.[76] Busey contends that he is one of a class of people who were perceived to be or in fact were loyal to former sheriff Meneley ("Meneleyized"). Busey recognizes that the Tenth Circuit has not expanded § 1985 to a class based on political loyalty or association, but argues that § 1985 was intended to cover such classes. The Court declines to expand the parameters of § 1985 in this way.

The concept of "class-based animus" has been narrowly construed and does not, for example, contemplate conspiracies motivated by an economic or commercial bias.[77] The Tenth Circuit has rejected a variety of attempts to more loosely define a class, including teachers,[78] handicapped persons,[79] and those with similar political beliefs or expressions.[80] Busey's claim that he is part of a class of people who were considered "Meneleyized" cannot meet the class-based animus element of a § 1985 claim. Accordingly, his conspiracy claim fails as a matter of law, and summary judgment is granted on this issue.

## C. Qualified Immunity

Because Busey failed to meet his initial burden of alleging a constitutional violation, either in violation of § 1983 or § 1985, "there is no necessity for further inquiries concerning qualified immunity."[81]

## D. Retaliatory discharge/Constructive discharge

■ Busey also alleges claim for constructive discharge. Although constructive discharge does not by itself constitute a cognizable claim, it is an element of both federal discrimination claims and state wrongful discharge claims.[82] Busey's constructive discharge claim no longer applies to his federal discrimination claims brought under § 1983, and to the extent it was brought as a separate claim, summary judgment is granted. Kansas courts have neither permitted nor prohibited breach of employment contract claims where constructive discharge is alleged.[83] Because the Court declines to exercise supplemental jurisdiction over Busey's remaining

**75.** *Tilton v. Richardson,* 6 F.3d 683, 686 (10th Cir.1993), *cert. denied* 510 U.S. 1093, 114 S.Ct. 925, 127 L.Ed.2d 218 (1994).

**76.** *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Bisbee v. Bey,* 39 F.3d 1096, 1102 (10th Cir.1994).

**77.** *United Broth. of Carpenters and Joiners of America, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 837, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983).

**78.** *Pitts v. Board of Educ. of U.S.D. 305, Salina, Kansas,* 869 F.2d 555, 557 (10th Cir. 1989).

**79.** *Wilhelm v. Continental Title Co.,* 720 F.2d 1173, 1176 (10th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1601, 80 L.Ed.2d 131 (1984).

**80.** *Brown v. Reardon,* 770 F.2d 896, 907 (10th Cir.1985).

**81.** *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

**82.** *Goodwin–Haulmark v. Menninger Clinic, Inc.,* 76 F.Supp.2d 1235, 1238 (D.Kan.1999) (citation omitted).

**83.** *See id.* at 1239; *Leopoldstadt, Inc. v. Fitzgerald,* 1992 WL 396330 *5–6 (D.Kan. Dec.22, 1992) ("Kansas would recognize a cause of action for breach of an employment contract due to constructive discharge.")

state law claims, it takes no position on the viability of this claim.

### E. State law claims

 Having found that summary judgment is appropriate on the plaintiff's federal claims under §§ 1983 and 1985, the Court must determine whether it should exercise continuing jurisdiction over plaintiff's remaining state law claims for retaliatory discharge and invasion of privacy/false light. By statute, the court is authorized to decline supplemental jurisdiction upon the dismissal of all claims over which it had original jurisdiction.[84] The exercise of supplemental jurisdiction is committed to the court's sound discretion.[85] 28 U.S.C. § 1367 "reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, con-

venience, fairness and comity.' "[86] "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary."[87]

 This case was removed to federal court under 28 U.S.C. § 1441. According to the Pretrial Order (Doc. 105), subject matter jurisdiction in this case is invoked solely under 28 U.S.C. §§ 1331 and 1343 based on the federal questions presented by Busey's §§ 1983 and 1985 claims.[88] Here, the Court has dismissed Busey's federal claims, over which it had original jurisdiction. Consequently, this Court, in its discretion, declines to exercise supplemental jurisdiction over Busey's remaining state law claims.[89] Given this, the Court remands the case to the District Court of Shawnee County, Kansas for further proceedings on Busey's retaliatory discharge and invasion of privacy/false light claims.[90] Accordingly, defendants' motions for sum-

---

84. 28 U.S.C. § 1367(c)(3).

85. *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 172–73, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997); *see Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir.1995).

86. *City of Chicago*, 522 U.S. at 173 (quoting *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)); *see also Gold v. Local 7 United Food and Commercial Workers Union*, 159 F.3d 1307, 1310 (10th Cir.1998).

87. *Thatcher Enterprises v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir.1990).

88. The court notes that the Pretrial Order goes on to state that "plaintiff believes that if the federal claims are dismissed, the state claims should either be remanded to state court or this court should retain jurisdiction over them on the basis of diversity ..." Diversity jurisdiction has never been asserted or alleged by either party; defendants removed the action on the basis of federal question jurisdiction and plaintiff moved to have the supplemental state law claims remanded.

Judge Saffels denied Busey's motion to remand, specifically exercising supplemental jurisdiction over plaintiff's state law claims. (Doc. 12). Jurisdiction cannot be conferred upon a federal court by consent, inaction or stipulation. *Tuck v. United Services Auto. Ass'n*, 859 F.2d 842, 844 (10th Cir.1988), *cert. denied* 489 U.S. 1080, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989) (quoting *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir.1974)) (citations omitted). The Court will not presume diversity jurisdiction under these circumstances.

89. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Tucker v. Spring Hill Unified School District No. 230*, 2002 WL 389286, *2–3 (D.Kan. Feb.27, 2002).

90. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); *see also* 28 U.S.C. § 1447(d) ("An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise ....")

mary judgment as to those claims are denied as moot. In this case, because discovery is complete, the Court conditions remand on use of all discovery in the state court proceedings.

IT IS THEREFORE BY THE COURT ORDERED that defendants' Motions for Summary Judgment (Doc. 113 and 115) are GRANTED with respect to plaintiff's federal claims under §§ 1983 and 1985, and DENIED WITHOUT PREJUDICE as moot with respect to plaintiff's state law claims.

IT IS FURTHER ORDERED that the Court declines to exercise supplemental jurisdiction over the remaining state law claims and the case be remanded to the District Court of Shawnee County, Kansas for further proceedings on plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c)(3) and § 1447(c).

IT IS FURTHER ORDERED that plaintiff's motion to strike (Doc. 124) is DENIED as moot.

IT IS SO ORDERED.